IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

STEPHEN BOWERY,                    )
                                   )
                Plaintiff,         )
                                   )
v.                                 )        No. 3:11-CV-03
                                   )
BERKSHIRE LIFE                     )
INSURANCE COMPANY OF               )
AMERICA,                           )
                                   )
                Defendant.         )

## MEMORANDUM OPINION

This civil action is before the court for consideration of the "Motion for Summary Judgment" filed by defendant Berkshire Life Insurance Company of America [doc. 20]. Plaintiff Stephen Bowery has filed a response in opposition to the motion [doc. 24], and defendant has submitted a reply [doc. 25]. Oral argument is unnecessary, and the motion is ripe for the court's determination.

Plaintiff has filed a complaint alleging two counts, breach of an insurance contract and a claim for bad faith that includes a demand for punitive damages. For the reasons that follow, the motion will be granted in part and denied in part.

# I.

## *Background*

Plaintiff has an employment background in the manufactured home industry where he began as a salesman and later was promoted to management. In November 2008, plaintiff formed American Dream Homes by purchasing the inventory of the home dealership he had been operating. Eventually plaintiff hired an assistant, Duane Bush. On July 12, 2010, plaintiff began working for Wyndham Vacation Resorts as a sales representative and turned everything at American Dream Homes over to Bush.

Plaintiff suffers from several medical and psychological conditions that require prescription medication. He has received treatment for Obsessive Compulsive Disorder ("OCD"), depression and anxiety, intermittent explosive personality disorder, as well as for the physical pain from gout and a prior shoulder injury.

In August 1997, plaintiff purchased a total disability insurance policy ("the Policy") from Guardian Life Insurance Company of America; defendant is an wholly-owned subsidiary of Guardian and administers its disability policies. The Policy defines "total disability" in relevant part as:

> Total disability means that, because of sickness or injury, you are not able to perform the major duties of your occupation.
>
> Your occupation means the regular occupation (or occupations, if more than one) in which you are engaged at the time you become disabled.

2

> You will be totally disabled even if you are at work in some
> other capacity so long as you are not able to work in your
> occupation.

The elimination period is three months and the accumulation period is seven months.

At the time plaintiff made application for the policy, an optional rider for "residual disability" coverage was available to him. According to the declaration of Valerie Andersen, a Senior Claims Consultant for defendant, "[t]he 'residual disability' rider would have provided coverage if Mr. Bowery was at work and still able to perform some of the material and substantial duties of his occupation but had a reduction in income because of his sickness or injury." On August 21, 1997, plaintiff signed a Change Application For Disability Income Insurance, in which plaintiff requested that the residual benefit rider be removed from the policy. Thus, the policy issued to plaintiff provided for only "total disability" benefits.

In December 2009 plaintiff submitted a claim for "total disability" benefits. He reported that the nature of his sickness was OCD and manic/depressive syndrome and that he had not worked in his occupation due to disability from April 2009 to December 2009. In the claim form plaintiff reported that his occupational duties listed in order of importance were:

a) Manage Business & Supervise Salesman – 60%

b) Direct Sales – 20%

c) Normal Office Duties – 20%.

3

After receiving plaintiff's claim, defendant assigned the claim to Andersen, who conducted an investigation that spanned approximately seven months and included correspondence with plaintiff's counsel at the time, the acquisition of plaintiff's medical and prescription records, and the securing of two consulting doctors to review and analyze plaintiff's records. The consultants, Howard J. Oakes, Psy.D. and Thomas Higgins, M.D., each rendered reports of their review findings.

After obtaining all the information, Andersen met with her manager to discuss plaintiff's claim. The decision was made to deny the claim, and in a letter dated July 9, 2010, Andersen wrote to plaintiff's attorney about the decision. In addition to the results of the medical consultation results, one reason given for the denying the claim was because plaintiff continued to work during the pendency of his claim. Within days of the denial letter being sent, plaintiff began working at Wyndham. Neither plaintiff nor his counsel informed Andersen of plaintiff's decision regarding the change in jobs.

On December 7, 2010, plaintiff filed his complaint in the Circuit Court for Knox County, Tennessee. Defendant removed the case to this court on January 5, 2011, on the basis of diversity jurisdiction.

4

## II.

### *Standard of Review*

Defendant's motion is brought pursuant to Federal Rule of Civil Procedure 56, which governs summary judgment. Rule 56(a) sets forth the standard for governing summary judgment and provides in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The procedure set out in Rule 56(c) requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion." This can be done by citation to materials in the record, which include depositions, documents, affidavits, stipulations, and electronically stored information. Fed. R. Civ. P. 56(c)(1)(A). Rule 56(c)(1)(B) allows a party to "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).

5

In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id.* at 255. The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

## III.

### *Analysis*

### Objection to Evidence

In its reply brief, defendant objects to several documents that plaintiff included in his response: a statement by Duane Bush dated October 19, 2010; a letter from plaintiff's treating physician Dr. Julius von Clef; and multiple letters from plaintiff's counselor, Ronald Lauderdale. Defendant objected that the letters were not authenticated and are hearsay and therefore cannot be used to create a material issue of fact.

As a result, plaintiff filed two motions to amend his response [docs. 26, 30] in which he sought permission to provide authenticating affidavits for the Bush statement and the von Clef letter. The court granted these motions and allowed authenticating affidavits to be filed [doc. 34]. Plaintiff, however, never sought to provide an authenticating affidavit for the Lauderdale letters, and at no time has plaintiff responded to defendant's objection that

6

the statement and letters comprise hearsay and cannot be considered on summary judgment.

Because of the 2010 amendments to Rule 56, the "submission of unauthenticated exhibits is not a violation of any express obligation imposed by the Rules. Rather, it is grounds for objection, in which case the proponent has the burden to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Foreword Magazine, Inc. v. Overdrive, Inc.*, No. 1:10-cv-1144, 2011 WL 5169384, at *2 (W.D. Mich. Oct 31, 2011) (citing Federal Rule of Civil Procedure 56). Defendant has objected, and plaintiff has only partially addressed the issues, and as the proponent of the evidence, he has the burden to demonstrate it is admissible. *Id*.

The Bush and von Cleft affidavits both attest to the accuracy of the attached document, the Bush statement and the von Cleft letter. One method of showing authenticity is by the testimony of a witness who has knowledge and is attesting that the "item is what it is claimed to be." Federal Rule of Evidence 901(b)(1). Thus, the testimony by Bush that the statement was written by him and the testimony by von Cleft that the letter was written by him are sufficient verification of those documents. However, "regardless of whether a document is authenticated for purposes of Federal Rule of Evidence 901, it must still be admissible." *Worthy v. Mich. Bell Tel Co.*, 472 F. App'x 342, 344 (6th Cir. 2012) (citing *United States v. Jones*, 107 F.3d 1147, 1159 (6th Cir. 1997) (citing 5 Jack B. Weinstein *et al.*, *Weinstein's Evidence* ¶ 901(a)[02], at 901-28 (1996) ("A document is not admissible simply because it has been authenticated. For example, if offered to prove the truth of

7

assertions made in it, the document will need to meet hearsay requirements.")))

The Bush statement and the von Cleft letter are both hearsay. "Federal Rule of Evidence 801(c) defines 'hearsay' as a 'statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'" *United States v. Johnson*, 581 F.3d 320, 331 (6th Cir. 2009) (citing Fed. R. Evid. 801(c)). The Bush declaration and von Cleft letter are both out-of-court statements offered for the truth of the matter asserted in them. Inadmissible hearsay cannot be considered for the purposes of ruling on a summary judgment motion. *See Saulsberry v. FedEx Exp.*, No. 2:11-cv-02581-AJT-cgc, 2013 WL 596061, at *2 n.5 (W.D. Tenn. Jan. 15, 2013) (citing *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir 1999)). Furthermore, "[a]lthough a district court may consider some forms of hearsay evidence in deciding a motion for summary judgment, Fed. R. Civ. P. 56(c), such evidence must still be admissible at trial." *Worthy*, 472 F. App'x at 343 (citation omitted). In any event, plaintiff has not responded at all to defendant's objection to the hearsay evidence, let alone argue that the hearsay evidence is admissible as an exception. "[T]he burden of proving that the statement fits squarely within a hearsay exception rests with proponent of the hearsay exception." *United States v. Arnold*, 486 F.3d 177, 206 (6th Cir. 2007) (internal quotation marks and citation omitted). Therefore, although the Bush statement and von Clef letter have been authenticated, they have not been presented as admissible evidence and will not be considered by the court. The Lauderdale letters have not been authenticated or

8

presented as admissible evidence. They too are hearsay, and likewise, the court will not consider those letters in its analysis of defendant's motion for summary judgment.

## Breach of Contract Claim

Plaintiff alleges that defendant has breached the insurance contract by failing to perform its contractual obligations under the terms of the policy by failing to pay him total disability payments. Defendant contends that plaintiff does not qualify as being totally disabled under the terms of the contract and is therefore not entitled to benefits.

To state a claim for the breach of this insurance contract, plaintiff must set forth some conduct by the defendant "that was inconsistent with one or more provisions of the insurance policy and that he suffered damages as a result." *Watry v. Allstate Prop. & Cas. Ins. Co.*, No. M2011-00243-COA-R3-CV, 2011 WL 6916802, at *4 (Tenn. Ct. App. Dec. 28, 2011). When interpreting insurance contracts, the court generally utilizes the same rules of construction as are applicable to other contracts. *Marlin Fin. & Leasing Corp. v. Nationwide Mut. Ins. Co.*, 157 S.W.3d 796, 808-09 (Tenn. Ct. App. 2004). Insurance contracts are to be interpreted as written and their terms are given their ordinary and plain meaning. *Id*. at 809. The law in Tennessee is that any ambiguities or uncertainties in an insurance policy "must be construed strongly against the insurer and in favor of the insured." *Id*. at 809 (quoting *Travelers Ins. Co. v. Aetna Cas. & Sur. Co.*, 491 S.W.2d 363, 366 (Tenn. 1973)).

9

Defendant argues that in order to qualify for "total disability" benefits plaintiff must demonstrate that he is unable to perform all of the major duties of his occupation at the time he claimed disability. Defendant points out that the Policy provided for a "residual disability" rider that would have provided coverage if plaintiff could still perform some material and substantial duties of his occupation; however, plaintiff removed the rider from the Policy. Thus, the residual disability rider and the coverage it offered would be superfluous if the total disability provision did not require an inability to perform all of the major duties of plaintiff's occupation. In support of this argument, defendant relies on *Cunningham v. Paul Revere Life Ins. Co.*, No. 3:97-0740, 1998 U.S. Dist. LEXIS 22352 (M.D. Tenn. Aug. 24, 1998) and cases that are in line with its holding.

In *Cunningham*, the district court addressed whether a urologist who was no longer able to perform surgery was totally disabled under the terms of his disability policy. The disability clause of the policy provided coverage only when the insured was unable to perform the "important duties" of his occupation. The court held:

> [T]he use of the plural term "duties" indicates that Plaintiff was required to be unable to perform *any* of his important occupational functions. In addition, the inclusion of the "residual disabilities" clause, which provided for partial coverage in the event that Plaintiff became incapable of performing *one or more* "important duties," lends further support to Defendant's reading of the contract. . . . Interpreting the "total disabilities" clause to cover Plaintiff's loss in this case would render the "residual disabilities" clause superfluous. As such, a harmonious reading of the policy mandates the conclusion that the "total disability" clause provided coverage only if Plaintiff became unable to perform each and every one

10

of the important duties of the occupation.

*Id*. at *9-10 (emphasis in original). Plaintiff does not sufficiently distinguish this authority or cite contrary authority that is on point. Other courts also follow this line of reasoning.

In *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586 (8th Cir. 2002), the Eighth Circuit Court of Appeals addressed a policy in which the insured was "totally disabled if 'because of Injury or Sickness' he was 'unable to perform the important duties of [his] Occupation.'" *Id*. at 588. The court held:

> [T]he district court held that in order to recover benefits for total disability under the Paul Revere policy, [plaintiff] must be unable to perform any of the important duties of his position; that is, he was obligated to show that his disability prevented him from performing all of those duties, not just some of them. While the policy may not say so *in ipsis verbis*, we think that the district court's construction of it is the only one that comports with both reason and authority.
>
> The circumstances that in our minds most plainly supports this interpretation is that the policy allows for benefits for "Residual Disability" when the insured is "unable to perform one or more of the important duties" of his or her occupation. It is evident to us that a person who can perform some but not all of his or her important duties has "Residual Disability" within the meaning of the policy, and therefore in order to be eligible for total disability payments a person would be required to show that he or she was unable to perform any of those important duties.

*Id*.; *see also Bond v. Cerner Corp.*, 309 F.3d 1064 (8th Cir. 2002) (following *McOsker*); *Conway v. Paul Revere Life Ins. Co.*, No. Civ. 5:99CV150-T, 2002 WL 31770489, at *9 (W.D.N.C. Dec. 5, 2002) (totally disabled insured must show his disability prevented him

11

from performing all of those duties, not just some of them; otherwise existence of residual disability portion of the policy would have no meaning) (citing *McOsker*). The Eighth Circuit in *McOsker* also noted that other courts interpreting identical or substantially identical policy language reached the same result. *McOsker*, 279 F.3d at 588 (citing *Yahiro v. Nw. Mut. Life Ins. Co.*, 168 F. Supp. 2d 511, 517-18 (D. Md. 2001); *Dym v. Provident Life & Accident Ins. Co.*, 19 F. Supp. 2d 1147, 1149-50 (S.D. Cal. 1998); *Giampa v. Trustmark Ins. Co.*, 73 F. Supp. 2d 22, 27-29 (D. Mass. 1999)). In addition, the Sixth Circuit in *Phelps v. Unum Provident Corp.*, 245 F. App'x 482 (6th Cir. 2007) in its analysis of a bad faith claim stated the following:

> The context in which [plaintiff] obtained this policy also gave the insurance company a reasonable basis for denying coverage. At the time [plaintiff] purchased this policy, Unum offered a "residual disability" rider. It defined "residual disability" to mean the "inability of the Insured to perform one or more but not all of the material and substantial duties of his regular occupation" or "loss by the Insured of at least 25% of the time usually required for the performance of the material and substantial daily duties of his regular occupation." The existence of this additional coverage option - defining eligibility based on an inability to perform "one or more" material duties or based on an inability to work a certain amount of time - and [plaintiff's] decision not to purchase this rider also support the reasonableness of Unum's position that "total disability" required an insured to show something more than an inability to perform certain material duties of a dentist.

*Id*. at 485.

The court is persuaded by this authority. The existence of the residual disability rider that was offered to and rejected by plaintiff would have no meaning unless

total disability under the Policy requires plaintiff to show an inability to perform *all* of his major duties. Therefore, the court concludes that plaintiff will need to demonstrate that he is unable to perform all of the major duties of his occupation in order to be entitled to total disability benefits under the Policy.

Defendant argues that plaintiff's testimony that he continued to work while his disability claim was pending shows as a matter of law that he has not met the total disability standard under the Policy. Plaintiff contends that there is testimony from Dr. von Clef, who performed plaintiff's disability exam in December 2009, to show plaintiff's disability and inability to perform the duties of his occupation.

Dr. von Clef testified that in his opinion plaintiff is disabled from the occupation of a management position, as plaintiff was doing in managing his business, and that the disability began in 2009, prior to the December 2009 exam. Dr. von Clef testified in detail about the medical and psychological conditions from which plaintiff suffers and the medications he prescribed, some of which could cause drowsiness and affect mental performance. He also stated that he knew plaintiff was dealing with the public and supervising people under him and "apparently he was having significant problems to the point where the people who were working under him were helping him to get through – through each day." Dr. von Clef's deposition also reflects the following testimony:

> Q. You mentioned that, and I tried to write down what you said but I apologize if I didn't get –
>
> A. Uh-huh.

Q.     – exactly the way you described it.  That he was having significant problems where people were helping him to get through each day.  What were those people doing to help him get through the day?

A.     Basically, from what he was telling me, he was going to work and they were basically taking over running the – business, making the decision – making decisions that he was supposed to have been making as far as running the business.  He was showing up to work.  He couldn't concentrate.  His memory was poor.  He was disorganized.  And there were people stepping in to try to keep things – keep the company up and going and basically doing his job.

. . .

Q.     . . . Let's talk about intermittent explosive personality disorder?

A.     . . . He – but some of that was carrying  – again, that was carrying over into the workplace where he was – if something didn't go his way, then he was telling me that he just – he would just kind of get very angry and upset.  And apparently I think the staff that was there were trying to work hard and trying to keep him settled down.  And it may have been some – you know, I've had this happen with other patients in other positions where the – you know, obviously their jobs are at stake so they try to cover up or try to help them through that or say hey, you know, we'll take care of this.  Don't worry about it.

So they – they were – I guess he had some supervisors under him that were trying to do – do his job when he was the one that was supposed to be making those decisions and there was other people that were making decisions. . . .[1]

_____

[1] Defendant did not object to Dr. von Clef's deposition testimony, and therefore the court has considered it.  Fed. R. Civ. P. 56.

14

Therefore, the court concludes that material issues of fact exist concerning whether plaintiff was performing any of the major duties of his occupation when he continued to work. Based upon the authority discussed herein, if plaintiff was performing any of his major duties he would not be totally disabled under the policy. The question is one for the trier of fact. Accordingly, the court will deny defendant's motion for summary judgment as to plaintiff's breach of contract claim.

## Bad Faith and Punitive Damages Claim

Count two of plaintiff's complaint asserts a claim for "Bad Faith" and includes a demand for punitive damages as a result of the bad faith. Defendant argues that there is no evidence to support a claim for bad faith and that punitive damages are not available in this case. Plaintiff's bad faith and punitive damages claim fails for two separate reasons.

Initially, the court notes that plaintiff has not pled the statutory cause of action for bad faith, which is the exclusive remedy available. In *Leverette v. Tennessee Farmers Mutual Insurance Company*, No. M2011-00264-COA-R3-CV, 2013 WL 817230 (Tenn. Ct. App. Mar. 4, 2013), the plaintiffs had pled the tort of bad faith, not the statutory action for bad faith pursuant to Tennessee Code Annotated § 56-7-105. At trial, the plaintiffs had been awarded compensatory damages for bad faith and an award of punitive damages. The Court of Appeals reversed those findings, and in doing so, reaffirmed that "Tennessee does not recognize the tort of bad faith in suits between an insured and her insurer where the actions

15

complained of are covered by the bad faith penalty statute." *Id*. at *17. The Court further reaffirmed "that the bad faith statute, Tenn. Code Ann. § 56-7-105, provides the exclusive remedy for an insurer's failure to pay a claim in bad faith." *Id*. at 18 (citing *Chandler v. Prudential Ins. Co.*, 715 S.W.2d 615, 619 (Tenn. Ct. App. 1986)); *see also Cracker Barrel Old Country Store, Inc. v. Cincinnati Ins. Co.*, 590 F. Sup. 2d 970, 972 (M.D. Tenn. 2008), *overruled on other grounds by Heil Co. v. Evanston Ins. Co.*, No. 11-6252, 2012 WL 3139935 (6th Cir. Aug. 3, 2012) ("Tennessee does not recognize a general common law tort for bad faith by an insurer against an insured; the exclusive remedy is statutory.").

The Court in *Leverette* found that plaintiffs had not pled in the complaint liability based upon Tenn. Code Ann. § 56-7-105 and nothing in the record indicated such a claim. The Court concluded that "by submitting the question of punitive damages to the jury and approving the award of punitive damages for bad faith, rather than the 25% statutory penalty, it is clear that any 'bad faith' liability was based on Plaintiff's claim for 'the tort of bad faith' as stated in the Complaint." *Leverette*, 2013 WL 817230, at *17. Other courts have specifically held that punitive damages are not available in the context of this case. *Mathis v. Allstate Ins. Co.*, No. 91-5754, 1992 WL 70192, at *4 (6th Cir. Apr. 8, 1992) ("[T]he trial judge correctly noted that the 25 percent penalty provided for in Tenn. Code Ann. § 56-7-105(a) has been deemed the exclusive remedy for losses stemming from an insurer's bad faith refusal to pay a claim.); *Heil,* 690 F.3d at 728 ("Tenn. Code Ann. § 56-7-105 precludes punitive damages here because it provides the exclusive extracontractual

remedy for an insurer's bad faith refusal to pay on a policy.") (citing *Mathis*); *Davidoff v. Progressive Hawaii Ins. Co.*, No. 3:12-00965, 2013 WL 124353, at *2 (M.D. Tenn. Jan. 9, 2013) (plaintiffs not entitled to punitive damages for defendant's alleged bad faith refusal to pay on insurance contract ) (relying on *Heil*).   In the case herein, plaintiff has made no reference to Tenn. Code Ann. § 56-7-105 in the complaint; rather he alleges bad faith based upon the denial of his claim and an entitlement to punitive damages.   Thus, plaintiff has asserted only a common-law claim for bad faith which is not recognized in Tennessee.   On that basis, the claim fails.

Nevertheless, even if plaintiff had asserted the statutory bad faith cause of action, the claim would still fail for insufficient proof.   To recover a bad faith penalty under Tenn. Code Ann. § 56-7-105, the plaintiff must prove:

> (1) the policy of insurance must, by its terms, have become due and payable, (2) a formal demand for payment must have been made, (3) the insured must have waited 60 days after making demand before filing suit (unless there was a refusal to pay prior to the expiration of the 60 days), and (4) the refusal to pay must not have been in good faith.

*Stooksbury v. Am. Nat'l Property & Cas. Co.*, 126 S.W.3d 505, 519 (Tenn. Ct. App. 2003) (citations omitted).   The insured has the burden of demonstrating that the insurance company acted in bad faith by refusing to pay the claim.   *Id.*; *see also Marlin Fin. & Leasing Corp. v. Nationwide Mut. Ins. Co.*, 157 S.W.3d 796, 812 (Tenn. Ct. App. 2004) (citing *Palmer v. Nationwide Mut. Ins. Co.*, 723 S.W.2d 124, 126 (Tenn. Ct. App. 1986)).   In addition, the Tennessee Court of Appeals in *Sisk v. Valley Forge Ins., Co.*, 640 S.W.2d 844 (Tenn. Ct.

17

App. 1982) explained:

> The bad faith penalty is not recoverable in every refusal of an insurance company to pay a loss. *An insurance company is entitled to rely upon available defenses and refuse payment if there is substantial legal grounds that the policy does not afford coverage for the alleged loss. If an insurance company unsuccessfully asserts a defense and the defense was made in good faith, the statute does not permit the (sic) imposing of the bad faith penalty.*

*Id.* at 852 (emphasis in original) (quoting *Nelms v. Tenn. Farmers Mut. Ins. Co.*, 613 S.W.2d 481, 484 (Tenn. Ct. App. 1978)); *see also Sowards v. Grange Mut. Cas. Co.*, No. 3:07-cv-0354, 2008 WL 3164523, at *8 (M.D. Tenn. Aug. 4, 2008) ("[I]f an insurer asserts a defense in good faith, the bad faith penalty may not be imposed even if the defense is unsuccessful."). In addition, "[t]o sustain a claim for failure to pay in bad faith a plaintiff must demonstrate there were no legitimate grounds for disagreement about the coverage of the insurance policy." *Fulton Bellows, LLC v. Fed. Ins. Co.*, 662 F. Supp. 2d 976, 996 E.D. Tenn. 2009) (internal quotation marks and citations omitted); *see also Zientek v. State Farm Int'l Servs., Inc.*, No. 1:05-CV-326, 2006 WL 925063, at *4 (E.D. Tenn. Apr. 10, 2006) ("To show Defendant acted in bad faith, Plaintiffs must show there were no legitimate grounds for disagreement about the coverage of the insurance policy.") (citing *Marlin*, 157 S.W.3d at 812-13).

After plaintiff submitted his claim for benefits in December 2009, defendant began an investigation that continued for approximately seven months. The consultant assigned to Senior Claims Consultant, Valerie Andersen, obtained and performed a review

18

of plaintiff's medical and prescription drug records.[2]  Andersen sent the records to two consulting doctors for their review and analysis.  Both doctors generated reports containing their conclusions.  A senior field consultant interviewed plaintiff and Bush, an employee who assisted plaintiff in his business.  After accumulating all of the documentation and information, Andersen and her manager met to review the claim and information obtained.  In her declaration, Andersen states that they "had received information from multiple sources during the investigation that Mr. Bowery had continued to work at American Dream Homes and continued to interact with customers, vendors, and the general public."  Based upon all the information available to them, Andersen and her manager concluded that plaintiff was not eligible to receive total disability benefits.  Andersen states in her declaration the following regarding their reasoning and conclusions:

> My manager and I determined that to the extent there was any support of impairment found in Plaintiff's medical records, it did not exceed the Policy's elimination period.  This determination was based upon the medical record reviews performed by Dr. Higgins and Dr. Oakes.  Even if the existence of some impairment was supported beyond the elimination period, however, that would not have automatically rendered Mr. Bowery eligible for "total disability" benefits under the Policy.  The Policy requires that the impairment render the insured totally disabled and not able to perform the insured's "major duties."  Where an individual such as Mr. Bowery has continued to work, he is not eligible for "total disability" benefits because he is still able to perform at least some of his

---

[2] Andersen's declaration indicates that during the claims process she made repeated requests to plaintiff's counsel at the time for information and documentation verifying plaintiff's duties and involvement with his business.  She received very little information in response to her requests and "virtually no documentation to substantiate the information [she] was provided."

19

major duties.

Defendant conducted a thorough investigation that occurred over a period of about seven months. Its refusal to pay benefits was in reliance on the findings of that investigation, which included a consultative review of plaintiff's medical and prescription records and the information from more than one source that plaintiff continued to work. Based upon this information and the language of the policy, defendant concluded that plaintiff was not eligible for total disability benefits. In order to demonstrate that defendant acted in bad faith, plaintiff has the burden to show that "there were no legitimate grounds for disagreement about the coverage of the insurance policy." *Zientek*, 2006 WL 925063, at *4. Plaintiff has not done that. While plaintiff submitted materials in support of his claim that demonstrate he is totally disabled, defendant's investigation and information resulted in defendant coming to a different conclusion. Thus, there is legitimate ground for disagreement about the coverage of the policy. Even if defendant's position turns out to be unsuccessful, that does not constitute bad faith. *Sisk*, 640 S.W.2d at 852.

Defendant also had substantial legal grounds for its position that the language of the Policy defining total disability means that plaintiff must be unable to perform any of the major duties of his occupation to qualify as totally disabled. The "residual disability" coverage available under the Policy, which plaintiff chose to have removed from the Policy, would have provided coverage if because of sickness or injury plaintiff was working but unable to perform some of the material and substantial duties of his occupation, with a

reduction in income. The availability of the residual disabilities rider supports the interpretation of the policy to the effect that plaintiff must be unable to perform any of the major duties of his occupation. *Cunningham*, 1998 U.S. Dist. LEXIS 22352; *McOsker*, 279 F.3d 586; *Conway*, 2002 WL 31770489. Plaintiff testified in deposition that after Bush came to American Dream Homes, plaintiff managed the dealership and was responsible for everything. Bush was his assistant who was to look out for plaintiff and make sure he was "not doing stupid things." Thus, defendant could conclude that plaintiff was performing some of his major duties since he continued to work.

Therefore, plaintiff has not met the required burden of proof applicable to a statutory bad faith failure to pay claim, even if he had pled the statutory claim. For this reason, as well as because of his failure to properly plead a bad faith claim as required by Tennessee law, plaintiff's "bad faith" claim with demand for punitive damages asserted in count two of the complaint will be dismissed.

IV.

*Conclusion*

Accordingly, for the reasons stated above, defendant's motion for summary judgment will be granted in part and denied in part. The motion will be granted as to plaintiff's claim for bad faith and punitive damages, which will be dismissed. The motion

will be denied as to plaintiff's claim for breach of contract, which will proceed to trial.  An order consistent with this opinion will be entered.


ENTER:


_____s/ Leon Jordan_____
United States District Judge